FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

CLAUDE A. REESE, individually and
on behalf of all others similarly
situated,

           *Plaintiff-Appellee,*

    v.

BP EXPLORATION (ALASKA) INC.,
           *Defendant-Appellant.*

No. 10-35128

D.C. No.
2:08-cv-01008-MJP

OPINION

Appeal from the United States District Court
for the Western District of Washington
Marsha J. Pechman, District Judge, Presiding

Argued and Submitted
March 7, 2011—Seattle, Washington

Filed June 29, 2011

Before: M. Margaret McKeown, Raymond C. Fisher, and
Ronald M. Gould, Circuit Judges.

Opinion by Judge Gould

8757

## COUNSEL

Diane L. McGimsey of Sullivan & Cromwell LLP, Los Angeles, California, and David C. Lundsgaard of Graham & Dunn P.C., Seattle, Washington, for defendant-appellant BP Exploration (Alaska) Inc.

Thomas A. Dubbs and Javier Bleichman of Labaton Sucharow LLP, New York, New York, and Robert D. Stewart and Timothy M. Moran of Kipling Law Group PLLC of Seattle, Washington, for plaintiff-appellee Claude A. Reese.

## OPINION

GOULD, Circuit Judge:

BP Exploration (Alaska) Inc. ("BPXA") appeals the district court's order granting in part and denying in part BPXA's motion to dismiss a securities fraud action filed against it by Claude A. Reese ("Reese") on behalf of a class of purchasers of BP p.l.c. shares. On an interlocutory appeal, which was accepted by our court, BPXA asserts that Reese's surviving claims do not state a claim, warranting dismissal under Federal Rule of Civil Procedure 12(b)(6), because he has pled neither an actionable misrepresentation made by or attributable to BPXA nor sufficient evidence of scienter. Reese, in

turn, urges that we affirm the district court on the issues certified for interlocutory appeal and that we reverse part of the district court's order granting partial dismissal of his claims, or, alternatively, that we vacate the order granting interlocutory appeal.

We have jurisdiction pursuant to 28 U.S.C. § 1292(b). We hold that BPXA's breach of a contractual promise of specific future conduct, even though the contract is filed in conjunction with U.S. Securities and Exchange Commission ("SEC") reporting requirements, was not a sufficient foundation for a securities fraud action. We decline Reese's invitation to review other issues that were not certified for interlocutory appeal. In light of our conclusion that breached contractual obligations do not constitute misrepresentations by BPXA that are actionable under the securities laws, we need not reach the issue of scienter.

## I

This suit follows BPXA's temporary shut-down of its pipelines and oil production in Prudhoe Bay, Alaska, upon its discovery on August 6, 2006, of a leak in a pipeline located in its Prudhoe Bay Eastern Operating Area. The leak was found shortly after BPXA's discovery, on March 2, 2006, of a large spill of more than 200,000 gallons of oil that had leaked from another pipeline in the Western Operating Area of Prudhoe Bay. Both leaks resulted in substantial part from internal corrosion, caused by bacterial colonies that had formed inside BPXA's pipelines due to the presence of sediment and low-flow conditions. BPXA pled guilty on October 24, 2007, to a single count of violating the Clean Water Act, 33 U.S.C. §§ 1319(c)(1), 1321(b)(3), for the negligent discharge of a harmful quantity of oil to a water of the United States. In its plea agreement, BPXA said that it believed that corrosion of its pipelines was a low probability but admitted that it was aware of sediment buildup before the spills and failed to "pig"[1]

---

[1]The term "pig" comes from the term "pipeline inspection gauge." Pigging consists of (a) cleaning pipelines to rid them of sediment and bacteria

the pipelines or take other necessary action to prevent the leaks.

## A

Asserting claims arising under Sections 10(b), 18, and 20(a) of the Securities and Exchange Act as amended, 15 U.S.C. §§ 78b(b), 78r, and 78t(a), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5, Reese brings a class action against BP p.l.c.; its subsidiaries BP America, Inc. and BPXA; and four corporate officers ("Defendants") on behalf of all persons who acquired BP p.l.c. ordinary shares or American Depository Receipts ("ADRs") during the period of March 31, 2005 through August 4, 2006 ("class period").[2] Reese's consolidated class action complaint[3] alleges that, as a consequence of the leaks and the shutdown of BPXA's operations in Prudhoe Bay, BP p.l.c.'s stock price fell, and investors lost billions of dollars in market capitalization. According to Reese, the

and (b) pushing an in-line inspection tool through the pipelines to assess the presence and extent of any internal corrosion.

[2]Section 10(b) of the Securities Exchange Act of 1934 makes it unlawful "[t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b). Pursuant to this section, the SEC promulgated Rule 10b-5, which makes it unlawful, among other things, "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading." *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1108 (9th Cir. 2010) (quoting 17 C.F.R. § 240.10b-5(b) (internal quotation marks omitted)).

[3]Reese filed this complaint after the district court consolidated similar securities fraud actions and selected a lead plaintiff for the case, pursuant to the Private Securities Litigation Reform Act. The case was transferred to the Western District of Washington under 28 U.S.C. § 1404. Reese thereafter filed an amended consolidated class action complaint that is not at issue in this appeal.

August 2006 leak occurred despite BPXA's reassurances to investors that the corrosion leading to the earlier leak was an anomaly and that BPXA was taking necessary precautions to avoid another accident. The suit alleges that Defendants knew about corrosion in the Prudhoe Bay pipelines but did not take corrective action or disclose "the foreseeable risk" that BPXA would need to curtail its oil production as a result. Reese claims to have suffered economic loss and damages as a result of purchasing overpriced shares of BP p.l.c., in reliance on Defendants' misleading statements and omissions about BPXA's Prudhoe Bay operations.

To plead a private damages action for violation of § 10(b) and Rule 10b-5, a plaintiff must allege: (1) a material misrepresentation (or omission), (2) made with scienter, (3) on which plaintiff relied, (4) that proximately caused (5) economic loss, (6) in connection with the purchase or sale of a security. *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005). Only the first two elements are at issue in this appeal.

**(1)**

Reese's complaint lists many statements that he alleges are actionable material misrepresentations or omissions attributable to Defendants for the purposes of a securities fraud action. These statements include three remarks allegedly made by defendant Maureen Johnson, BPXA's Senior Vice President of the Greater Prudhoe Bay Unit, about the conditions of BPXA's pipelines during the class period. Reese also alleges that BPXA made false and misleading statements through the public SEC filings of the BP Prudhoe Bay Royalty Trust ("Trust").

The Trust is a Delaware business trust that was created for the purpose of distributing a Royalty Interest derived from oil production at Prudhoe Bay to purchasers of Trust units, which are traded on the New York Stock Exchange. The Trust was established in 1989 pursuant to the BP Prudhoe Bay Royalty

Trust Agreement ("Trust Agreement"), entered into by BPXA and The Standard Oil Company ("Standard Oil") with trustees The Bank of New York and F. James Hutchinson. The Trust Agreement provides, in relevant part:

> Section 4.05 — Information to be Supplied by [BPXA]. [BPXA] shall provide to the Trustee on a timely basis upon request such information not known or otherwise available to the Trustee concerning the Royalty Interest . . . as shall be necessary to permit the Trustee to comply with respect to the Trust with the reporting obligations of the Trust pursuant to the Securities Exchange Act of 1934, as amended, the requirements of any stock exchange on which the Units are listed and this Agreement and for any other reasonable purpose of the Trust.

> \* \* \*

> Section 6.01. — General Authority . . . [BPXA] and the Trustee are hereby authorized to make and shall be responsible for all filings on behalf of the Trust with the Securities and Exchange Commission [as legally required].

When the Trust was created, BPXA and Standard Oil also executed an Overriding Royalty Conveyance agreement ("ORC Agreement") to govern the details of the Royalty Interest that the Trust was to distribute. Through the ORC Agreement, BPXA granted Standard Oil the right to receive the Royalty Interest, which included a share of each day's production from Prudhoe Bay. Standard Oil then conveyed that interest to the Trust pursuant to the Trust Agreement.

As part of the ORC Agreement, BPXA contracted to operate Prudhoe Bay according to a "Prudent Operator Standard." Namely, BPXA agreed to "conduct and carry on the development, exploration, production, maintenance and operation of

[Prudhoe Bay] with reasonable and prudent business judgment, in accordance with . . . good oil and gas field practices, as a reasonable and prudent operator . . . ."

During each quarter of the class period, the Trust attached to its SEC filings both the ORC Agreement, with its "Prudent Operator Standard" provision, and the Trust Agreement, with its discussion of BPXA's role in the Trust's SEC filings. Relying on the premise that these agreements should be read together, Reese asserts that "the Trust Agreement establishes that the Royalty Trust's filings with the SEC constitute statements made by BPXA" and that the Trust's repeated filing of the ORC Agreement with the SEC "represented to the public" that BPXA was maintaining its contractual obligation to operate in accordance with the Prudent Operator Standard. Reese's complaint further alleges that "at the time of these filings, the statements that BPXA was abiding by the Prudent Operator Standard were materially false and misleading" because Defendants did not disclose, among other things, that the pipelines at Prudhoe Bay were under-inspected, under-maintained, and subject to a severe risk of corrosion-related failure; that BP had been warned that its pipelines were severely corroded; and that BP had not taken corrective action despite warnings.

## (2)

As regards scienter, Reese claims that BPXA "had actual knowledge of the misrepresentations and omissions of material fact [alleged], or acted with deliberate disregard for the truth" in failing to ascertain and disclose them, "for the purpose and effect of concealing Defendants' operations and business affairs from the investing public, thereby supporting the artificially inflated price of BP [p.l.c.]'s ordinary shares and ADRs." As evidence purportedly raising a strong inference of BPXA's state of mind,[4] Reese's complaint relies on,

---

[4]In private securities action requiring proof of scienter, the complaint must, "with respect to each act or omission alleged . . . , state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 74u-4(b)(2)(A).

among other things, BPXA's entry of a guilty plea in a crimi-
nal case for its violation of the Clean Water Act in connection
with the Prudhoe Bay oil spills.

**B**

Defendants filed a motion to dismiss Reese's complaint
pursuant to Federal Rule of Civil Procedure 12(b)(6), which
the district court granted in part and denied in part. The dis-
trict court dismissed as time-barred Reese's claim for viola-
tions of § 18 and also dismissed BP America, Inc. and one of
the corporate officers as defendants. The district court found
that the majority of the statements that Reese alleged to be
fraudulent—including the three statements allegedly made by
defendant Johnson—did not meet the heightened pleading
standards of the Private Securities Litigation Reform Act of
1995 ("PSLRA"). However, the district court found that
Reese had adequately pled § 10(b) and Rule 10b-5 violations
by defendant BPXA and, in part predicated on the survival of
those claims, had adequately pled personal control liability
pursuant to § 20(a) against BP p.l.c. and the three remaining
corporate officers. The parties filed cross-motions for recon-
sideration, and BPXA moved for certification of an interlocu-
tory appeal. The district court denied in part and granted in
part the parties' motions for reconsideration. It granted
BPXA's motion for interlocutory appeal. We approved the
interlocutory appeal.

**(1)**

In allowing the § 10(b) and Rule 10b-5 claims to proceed,
the district court found that Reese had adequately pled one
alleged misstatement or omission. It concluded that Reese
could use, "as evidence of false or misleading statements
upon which any investor was permitted to rely," the Trust's
"quarterly filings with the [SEC] made in connection with
BPXA's obligations under the [Trust Agreement] throughout
the purported Class Period (which included documents

wherein Defendants represented that they were in compliance with Alaska's Prudent Operator Standard)." The district court observed that BPXA could not evade the principle of *Brody v. Transitional Hospitals Corporation*, 280 F.3d 997 (9th Cir. 2002), that a statement is false if it "affirmatively create[s] an impression of a state of affairs that differs in a material way from the one that actually exists," by arguing that the statement was private contractual language. *Id.* at 1006. The district court held it was immaterial that the SEC filings were made by the Trust, and not BPXA, because "the Securities Act makes no allowance for how the allegedly false or misleading statement is made known to the public." The district court reasoned that there was no evidence that BPXA tried to have the contract withdrawn as an exhibit to the SEC filings and stated that "BPXA was content to have the document stand as a representation to the SEC that permitted them to continue their business arrangement" with the Trust.

**(2)**

The district court determined that the plea agreement executed by BPXA, and the admissions contained within it, gave evidence of a strong inference that BPXA acted with deliberate recklessness and that Reese had thus adequately pled scienter. The district court concluded that "[t]he fact that the agreement itself reflects a finding of criminal negligence . . . does not mean that this Court is confined to an identical conclusion on the same facts."

**(3)**

Observing that there was inadequate precedent squarely on point, the district court granted BPXA's motion for interlocutory appeal and, pursuant to 28 U.S.C. § 1292(b), granted certification on the following two questions:

   1.  Whether a contract to which a defendant is a party, filed in conjunction with SEC reporting

requirements and promising specific conduct by the defendant, can be used as the foundation for a securities fraud action by a nonparty to the contract.

2.  Whether the facts contained in a party's admission of criminal negligence as part of a misdemeanor guilty plea may be used as evidence of civil misconduct by the admitting party which requires an allegation of reckless or intentional misconduct as proof of scienter.

We granted BPXA's petition for permission to appeal.

## II

A non-final order may be certified for interlocutory appeal where it "involves a controlling question of law as to which there is substantial ground for difference of opinion" and where "an immediate appeal from the order may materially advance the ultimate termination of the litigation." 28 U.S.C. § 1292(b). Although we defer to the ruling of the motions panel granting an order for interlocutory appeal, "we have an independent duty to confirm that our jurisdiction is proper." *Kuehner v. Dickinson & Co.*, 84 F.3d 316, 318-19 (9th Cir. 1996). Here, we conclude that the requirements of § 1292(b) are met.

Reese contends that there exists no substantial ground for difference of opinion because there are no cases directly conflicting with the district court's construction of the law. But, as we see it, "this appeal involves an issue over which reasonable judges might differ" and such "uncertainty provides a credible basis for a difference of opinion" on the issue. *In re Cement Antitrust Litig.*, 673 F.2d 1020, 1028 (9th Cir. 1982) (Boochever, J., dissenting on other grounds). As we have previously noted, "[c]ourts traditionally will find that a substantial ground for difference of opinion exists where '. . . novel

and difficult questions of first impression are presented,' " as is the case here. *Couch v. Telescope Inc.*, 611 F.3d 629, 633 (9th Cir. 2010) (quoting 3 *Federal Procedure*, Lawyers Ed. § 3:212 (2010)). Our interlocutory appellate jurisdiction does not turn on a prior court's having reached a conclusion adverse to that from which appellants seek relief. A substantial ground for difference of opinion exists where reasonable jurists might disagree on an issue's resolution, not merely where they have already disagreed. Stated another way, when novel legal issues are presented, on which fair-minded jurists might reach contradictory conclusions, a novel issue may be certified for interlocutory appeal without first awaiting development of contradictory precedent.[5]

Reese also contends that certification was improvidently granted because a decision in BPXA's favor will not resolve all of Reese's claims against it, for Reese has filed an amended consolidated class action complaint asserting new claims against the defendant company. However, neither § 1292(b)'s literal text nor controlling precedent requires that the interlocutory appeal have a final, dispositive effect on the litigation, only that it "may materially advance" the litigation. 28 U.S.C. § 1292(b). The district court correctly concluded that our reversal "may" take BPXA, as a defendant, and Reese's control claims against all remaining defendants out of the case. That is sufficient to advance materially the litigation, and therefore certification of the interlocutory appeal was permissible.

---

[5]Adopting the formalistic requirement, urged by Reese, that adverse authority develop around an issue before we review it on interlocutory appeal could lead to unnecessary, protracted litigation and a considerable waste of judicial resources. We decline to adopt this rigid approach towards § 1292(b), whose use has been wisely targeted to avoid such undesirable consequences. *See* 16 Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 3929 (2d ed. 1987) (discussing flexible approach of appellate courts towards interlocutory appeals).

We hold that the order granting the interlocutory appeal need not be vacated. We proceed to the merits of the securities laws issues presented.

## III

Although the district court certified only two questions, in our exercise of discretion, we "may address any issue fairly included within the certified order because it is the order that is appealable, and not the controlling question identified by the district court." *Rivera v. NIBCO, Inc.*, 364 F.3d 1057, 1063 (9th Cir. 2004) (quoting *Yamaha Motor Corp., U.S.A. v. Calhoun*, 516 U.S. 199, 205 (1996) (internal quotation marks omitted)); *see South Ferry LP v. Killinger*, 542 F.3d 776, 786 (9th Cir. 2008) ("[W]e have jurisdiction to reach the merits of the entire complaint because it was at issue in the certified order."). Reese asks us to extend our review beyond the issues certified and to review the district court's conclusion that three allegedly false statements made by BPXA corporate officer and individual defendant Johnson were not actionable. We decline his invitation and focus on the certified questions.

Reese makes no attempt to argue that the additional issues on which he seeks reversal would independently merit interlocutory review. Nor did he ask the district court, in his motion for reconsideration, to reassess the rulings he now asks us to reverse. That he did not find the district court's alleged error on these rulings so plain as to seek reconsideration counsels against our reviewing them on interlocutory appeal. *See Nunes v. Ashcroft*, 375 F.3d 805, 807 (9th Cir. 2004) ("Reconsideration is appropriate if the district court . . . committed clear error." (quoting *Sch. Dist. No. 1J v. ACandS, Inc.*, 5 F.3d 1255, 1263 (9th Cir. 1993) (internal quotation marks omitted))). Moreover, Reese has filed an amended consolidated class action complaint reasserting, with additional reasons and support, the false and misleading nature of the statements he now asks us to review. Because the district court has not yet assessed whether the amended allegations

are adequate, it would be a waste of judicial resources for us to review its rejection of the pre-amended version of those allegations. *Cf. Morrison-Knudsen Co., Inc. v. Archer*, 655 F.2d 962, 966 (9th Cir. 1981) ("One of the principal reasons a Court of Appeals will exercise its discretion not to grant applications under section 1292(b) is the likelihood or probability of the appellate court's having to issue multiple opinions on the same or closely related issues of law or fact in the case.").

Reese's decision not to file a cross-petition under Federal Rule of Appellate Procedure 5(b)(2) also weighs against entertainment of the rulings he now asks us to reverse. Rule 5(b)(2) provides that, when a party files a petition seeking discretionary appeal, other parties to the case "may file an answer in opposition or a cross-petition within 10 days after the petition is served." Fed. R. App. P. 5(b)(2). BPXA contends, we think with some merit, that this time requirement would be meaningless if the filing of a cross-petition were optional. Consistent with this reasoning, other circuit courts have held that a Rule 5(b)(2) cross-appeal is a prerequisite to appellate review of issues raised by appellees on interlocutory appeal. *E.g.*, *Sikes v. Teleline, Inc.*, 281 F.3d 1350, 1367 n.44 (11th Cir. 2002) ("The plaintiff's failure to file a cross-appeal violates the requirement of Fed. R. App. P. 5(b)(2) and means that the plaintiffs have not preserved this issue for appeal."), *abrogated on other grounds by Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639 (2008); *Tranello v. Frey*, 962 F.2d 244, 248 (2d Cir. 1992) ("The failure to file the petition for permission to cross-appeal . . . is a jurisdictional defect, barring this Court from hearing [plaintiff's] cross-appeal.").

An appellee is well-advised, in seeking interlocutory review of issues not certified, to file a Rule 5(b)(2) cross-petition. Its failure to do so and election to raise an issue only in its answering brief disadvantages appellants, who are unable to anticipate presciently and to address adequately the issue in their opening brief. Reviewing an issue raised by a

party who has not filed a cross-petition also risks offending the party presentation principle, which makes clear that "an appellate court may not alter a judgment to benefit a nonappealling party." *Greenlaw v. United States*, 554 U.S. 237, 244 (2008). Particularly here, where a decision reversing the district court's rulings against Reese would affect not only appellant BPXA but also defendant Johnson, who is not a party to this appeal, proceeding absent a cross-appeal bringing in all affected parties is unlikely "to advance institutional interests in fair notice and repose." *Id.* at 245 (quoting *El Paso Natural Gas Co. v. Neztsosie*, 526 U.S. 473, 480 (1999) (internal quotation marks omitted)). However, we need not now determine with finality whether a party's failure to cross-appeal pursuant to Rule 5(b)(2) curtails the jurisdictional scope of our review on interlocutory appeal because, for the reasons stated above, we decline to exercise any discretion we may have to review the additional issues that Reese raises. *See Roth v. King*, 449 F.3d 1272, 1283 (D.C. Cir. 2006) ("We need not resolve these knotty issues raised in connection with § 1292(b) and Rule 5. The one thing that is clear here is that any review of appellees' purported cross-appeal is at most discretionary with this court."). Again, we prefer to keep our focus on the issues certified for interlocutory appeal.

## IV

The issues before us, then, narrow to whether the district court erred in permitting Reese's private action for securities fraud to stand on the basis of the alleged misstatement by BPXA, contained within a contract filed with the SEC, and whether Reese's allegations adequately plead scienter.

## (1)

**[1]** In assessing whether Reese has adequately pled a private federal action for securities fraud, we review de novo the district court's partial denial of BPXA's motion to dismiss. *See Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d

1025, 1030 (9th Cir. 2008). We accept all well-pled factual allegations as true and construe them in the light most favorable to Reese. *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008). However, in pleading fraud, "a party must state with particularity the circumstances constituting fraud or mistake," Fed. R. Civ. P. 9(b), and Reese must plead plausible allegations, *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949-50 (2009); *Cafasso v. Gen. Dynamics C4 Sys.*, 637 F.3d 1047, 1055 (9th Cir. 2011). The PSLRA also requires that a complaint alleging misleading statements or omissions "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, . . . all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). *See No. 84 Emp'r-Teamster Joint Council Pension Trust Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 937-38 (9th Cir. 2003) (discussing scienter pleading requirements); *In re Silicon Graphics Sec. Litig.*, 183 F.3d 970, 979 (9th Cir. 1999) (same); *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007) ("[A]n inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent."); *South Ferry LP*, 542 F.3d at 782-85 (9th Cir. 2008) (discussing scienter pleading requirements after *Tellabs*). Thus, the misrepresentation claims pled must satisfy the "particularity" requirement of Rule 9(b) of the Federal Rules of Civil Procedure, the "plausibility" requirement of *Iqbal,* and the scienter requirement of the PSLRA.

## (2)

**[2]** A statement or omission is misleading in the securities fraud context "if it would give a reasonable investor the 'impression of a state of affairs that differs in a material way from the one that actually exists.' " *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985 (9th Cir. 2008) (quoting *Brody*, 280 F.3d at 1006). The public filing of BPXA's contract, con-

taining its promise to conduct its Prudhoe Bay oil operations as a prudent operator, is an actionable misstatement if a reasonable investor would view it as a certificate of BPXA's compliance with that standard. Reese argues that there is a presumption that parties comply with their contractual obligations, and so a reasonable investor would presume that BPXA was complying with the Prudent Operator Standard when the ORC Agreement was filed with the SEC. Reese contends that BPXA's contractual statement of future compliance was transformed into a false "statement of current and ongoing compliance" because of its repeated filing by the Trust, for whose filings BPXA had contractual responsibility. He further argues that BPXA had a duty to correct the false impression by disclosing that it was not in compliance with the Prudent Operator Standard. *See In re Wells Fargo Sec. Litig.*, 12 F.3d 922, 926 (9th Cir. 1993) (stating that an omission is actionable where a plaintiff alleges that a defendant "omitted to state a material fact necessary to make the statements made, in light of all the circumstances in which they were made, not misleading" (quoting *In re Apple Computer Sec. Litig.*, 886 F.2d 1109, 1113 (9th Cir. 1989) (internal quotation marks omitted))).

**[3]** We disagree and reject Reese's contention that the Trust's filing of the ORC Agreement, in compliance with its legal obligations, would give a reasonable investor the impression that BPXA was in compliance with the Prudent Operator Standard provision of that agreement. That contract provision, read literally, was "forward-looking" and not a misrepresentation of current fact. "A 'promise' contained in a contract is not a certification that the promisor will actually perform the specified acts." *United States v. Blankenship*, 382 F.3d 1110, 1133 (11th Cir. 2004); *cf. Lockerby v. Sierra*, 535 F.3d 1038, 1042 (9th Cir. 2008) ("The concept of 'efficient breach' is built into our system of contracts, with the understanding that people will sometimes intentionally break their contracts for no other reason than that it benefits them financial-

ly.").[6] We acknowledge that some investors might presume that BPXA was in compliance with its contractual obligations. Nonetheless, the breach of a contractual promise of future performance typically does not constitute a misrepresentation that will support an action for fraud. This is true both as a general matter, *see* 26 *Williston on Contracts* § 69:11 (4th ed.) ("It is well settled that a claim of fraud must rest on an inaccurate assertion as to a matter of past or existing fact. As a corollary of this basic proposition, . . . representations as to expectations and predictions as to future results or events cannot support a fraud claim."), and in the context of private securities litigation, *see Foster v. Wilson*, 504 F.3d 1046, 1051 (9th Cir. 2007) ("At most, the claim alleges a breach of contract. Such a breach, however, does not constitute federal securities fraud under § 10(b)."). This principle that contract breach is not a sufficient predicate for securities fraud has been followed both by our circuit in *Foster* and by courts of other circuits. *See Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1176 (2d Cir. 1993) ("The failure to carry out a promise made in connection with a securities transaction is normally a breach of contract. It does not constitute fraud unless, when the promise was made, the defendant secretly intended not to perform or knew that he could not perform."); *see also ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 105 (2d Cir. 2007) (same); *Gurary v. Winehouse*, 235 F.3d 792, 801 (2d Cir. 2000) (same); *IDT Corp. v. eGlobe, Inc.*, 140 F. Supp. 2d 30, 35 (D.D.C. 2001) (same); *First Lincoln Holdings, Inc. v. Equitable Life Assurance Soc'y of the U.S.*, 164 F. Supp. 2d 383, 394 (S.D.N.Y. 2001) (same).[7]

---

[6]In this regard, it has been observed that "[t]he only universal consequence of a legally binding promise is, that the law makes the promisor pay damages if the promised event does not come to pass. In every case it leaves him free to break his contract if he chooses." Oliver Wendell Holmes, Jr., *The Common Law* 301 (Dover Publications, Inc. 1991).

[7]We recently applied the same principle in holding that contract breach did not provide an adequate predicate for a False Claims Act ("FCA") lawsuit. *See Cafasso*, 637 F.3d at 1057-58 ("[B]reach of contract claims are not the same as fraudulent conduct claims, and the normal run of contractual disputes are not cognizable under the [FCA]." (quoting *United States ex rel. Wilson v. Kellogg Brown & Root, Inc.*, 525 F.3d 370, 383 (4th Cir. 2008) (internal quotation marks omitted))).

**[4]** We recognize that even a promise that is forward-looking at the time it is made could conceivably become "an inaccurate assertion as to a matter of past or existing fact," 26 *Williston on Contracts* § 69:11, if its repeated filing "create[s] an impression of a state of affairs that differs in a material way from the one that actually exists," *Brody*, 280 F.3d at 1006. "[A] statement that is literally true can be misleading and thus actionable under the securities laws." *Id.* Reese argues that—although the Trust's filings, which included an accurate copy of the 1989 ORC Agreement, were in a sense "literally true," *id.*—the repeated filing of the ORC Agreement's Prudent Operator Standard provision "became a statement of current and ongoing compliance, which was false." We are not persuaded that Reese's allegations, if credited, are sufficient to show that BPXA affirmatively created such a false impression. The 1989 prudent operator promise was not only forward-looking in nature, but it was also contained in a document attached to SEC filings made to fulfill unrelated regulatory requirements.

In support of his contention that non-compliance with a publicly-filed contract may constitute a material misrepresentation supporting an action for securities fraud, Reese analogizes the present situation to that in *In re MobileMedia Securities Litigation*, 28 F. Supp. 2d 901 (D.N.J. 1998). There, a corporate defendant filed a SEC Form 8-K that included terms of a Credit Agreement that it had entered stating that its properties, equipment, and systems "are and will be in compliance with all terms and conditions of the FCC licenses." *Id.* at 917, 939. Plaintiffs contended that the defendant did not comply with those terms and conditions. *Id.* at 917. The district court concluded that "the inclusion of the terms of the Credit Agreement in the Form 8-K[ ] stood as a tacit representation that [the defendant] was in compliance with those terms;" that, "[b]y signing the 1996 Form 8-K, [the defendant] had an obligation not to mislead;" and that the plaintiffs had therefore sufficiently stated claims under § 10(b) and Rule 10b-5. *Id.* at 939 n.25, 940.

**[5]** But, as BPXA correctly notes, *MobileMedia* involved an express misrepresentation of present-existing fact and not merely a promise of future performance. In reaching its conclusion that plaintiffs had sufficiently alleged misrepresentations of material fact, the court observed that "facts demonstrating [that the defendant] was not in compliance with the terms of the Credit Agreement from the moment it was signed would be important to a reasonable investor." *MobileMedia*, 28 F. Supp. 2d at 939. *MobileMedia* is therefore consistent with the general principle that "[t]o be actionable, a statement or omission must have been misleading at the time it was made; liability cannot be imposed on the basis of subsequent events." *In re NAHC, Inc. Sec. Litig.*, 306 F.3d 1314, 1330 (3d Cir. 2002). *See Wortley v. Camplin*, 333 F.3d 284, 294 (1st Cir. 2003) ("When the defendant makes a specific promise . . . to perform an act, *while intending not to perform the act*, this may constitute a basis for a fraud finding." (emphasis added)). Reese does not allege that BPXA was in breach of the ORC Agreement's prudent operator obligation, or that BPXA intended to breach the obligation, when BPXA entered into the contract, and, in the circumstances here, we cannot conclude, based on repeated filing of a forward-looking promise alone, that BPXA made any statement of current compliance as of the time of filing. Therefore, to the extent that we might find *MobileMedia* persuasive in other factual contexts, we conclude that it does not substantially assist Reese in arguing that he has here pled a securities fraud claim based on the contractual provision.

**[6]** We therefore decline to hold that a reasonable investor would view the Trust's subsequent, periodic filing of the ORC Agreement as a certification of BPXA's ongoing compliance with the Prudent Operator Standard. The provision is quite broad—BPXA agrees to conduct *all* aspects of its operations "with reasonable and prudent business judgment" and "as a reasonable and prudent operator." These terms are generally interpreted as requiring the operator, here BPXA, to use the same practices as other, reasonable operators in the oil and

gas industry. *See* George A. Bibikos & Jeffrey C. King, *A Primer on Oil and Gas Law in the Marcellus Shale States*, 4 Tex. J. Oil, Gas, & Energy L. 155, 162-63 (2008-09) (discussing requirements of prudent operator standard). BPXA's obligations under the ORC Agreement were not static but evolved along with the industry and could change from one quarterly SEC filing to the next. Further, the provision is one section of a large and detailed contract whose main purpose was the conveyance by BPXA of a Royalty Interest to Standard Oil. The Trust was legally required to include the ORC Agreement in its SEC filings, showing the Royalty Interest to which it was due. Given the broad nature of the provision and the Trust's filing obligations, a reasonable investor would likely view the Trust's attachment of the ORC Agreement to its SEC filings as a statement of the rights of the Trust and its unit holders, not as certification by BPXA that all of its operations were in compliance with the Prudent Operator Standard.

[7] BPXA's contractual promise to act as a prudent operator did not expressly or implicitly assert that BPXA was in full compliance with its obligations thereunder, and we do not view the public filing of the ORC Agreement as the sort of traditional fraudulent misrepresentation of fact that could induce investors mistakenly to buy securities.[8] We hold that,

---

[8]Even if we read the periodic filings of the ORC Agreement as an implicit statement of BPXA's compliance with the Prudent Operator Standard, Reese's claims would still fail because Reese's allegations do not support a finding that the Trust's SEC filings are attributable to BPXA.

Reese alleges that BPXA shared responsibility for the Trust's SEC filings, but he does not allege that BPXA actually participated in and had authority over the Trust's filing process. This is important because, under the law of our circuit, defendants have been subject to primary liability under § 10(b) for the misstatements of others only if defendants are alleged to have been intricately involved or to have substantially participated in the making of those misstatements. *See Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1061 n.5 (9th Cir. 2000) ("[S]ubstantial participation or intricate involvement in the preparation of fraudulent statements is grounds for primary liability even though that participation might not lead

in this case, the public filing of a contract containing a promise of future compliance did not, upon the contract's breach at a time after execution, provide an actionable misrepresentation for the purposes of a private damages action for securities fraud.

## (3)

**[8]** Because the claims before us must be dismissed for failure to plead a misrepresentation under § 10(b) and Rule 10b-5, we need not reach the second certified issue on scienter. Similarly, as they depend upon the presence of a

---

to the actor's actual making of the statements."); *see also In re Cylink Secs. Litig.*, 178 F. Supp. 2d 1077, 1084 (N.D. Cal. 2001).

The insufficiency of Reese's pleadings are reinforced by the Supreme Court's recent opinion in *Janus Capital Groups, Inc. v. First Derivative Traders*, No. 09-525, 564 U.S. ___ (June 13, 2011), which sets the pleading bar even higher in private securities fraud actions seeking to hold defendants primarily liable for the misstatements of others. *See id.*, slip op. at 12 (holding that the allegation that the defendant was significantly involved in preparing the alleged misstatements was insufficient to state a claim for primary liability under Rule 10b-5). There, the Court explained that "[o]ne who prepares or publishes a statement on behalf of another is not its maker" because "[w]ithout control, a person or entity can merely suggest what to say, not 'make' a statement in its own right." *Id.* at 6. Accordingly, the Court held that, "the maker of a statement is the entity with authority over the content of the statement and whether and how to communicate it." *Id.* at 8.

It is clear that Reese's claims cannot be amended to meet this newly enunciated standard. As was fatal to plaintiffs' claims in *Janus Capital Groups*, here only the Trust—not BPXA—bore a statutory obligation to file with the SEC, and there is no allegation that BPXA made the filings and falsely attributed them to the Trust. *Id.* at 11. Reese does not allege that BPXA had ultimate authority over the Trust's SEC filings. Although the Trust Agreement provides that BPXA is "authorized to make and shall be responsible for" the Trust's filings, this provision does not demonstrate BPXA had "ultimate authority over the statement, including its content and whether and how to communicate it." *Id.* at 6.

misrepresentation, Reese's § 20(a) control liability claims also fail.

**REVERSED AND REMANDED.**